**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

CYTODYN INC.,                    )
                                 )
            Plaintiff,           )
                                 )
      v.                         )
                                 )        C.A. No.
PAUL A. ROSENBAUM, JEFFREY P.    )
BEATY, ARTHUR L. WILMES, THOMAS J. )
ERRICO, BRUCE PATTERSON, PETER   )
STAATS, MELISSA YEAGER, and CCTV )
PROXY GROUP, LLC,                )
                                 )
            Defendants.          )

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff CytoDyn Inc. ("CytoDyn" or the "Company"), by and through its undersigned counsel, for its claims against Defendants alleges the following based upon personal knowledge as to CytoDyn's own acts and upon information and belief as to all other matters.

*      *      *

On July 20, 2021, the Defendants filed a preliminary proxy statement (the "Preliminary Proxy") with the United States Securities and Exchange Commission ("SEC").  It repeatedly suggests that its proponents are "long-term [CytoDyn] stockholders" who for "the past seven years, have attempted to work with management to help solve the Company's issues, yet they have continually refused to engage with us constructively."  In short:  anyone reading the Preliminary Proxy would fairly believe that a group of outsiders banded together and attempted to take over the majority of the CytoDyn Board of Directors (the "CytoDyn Board").

Nothing could be further from the truth.  For example, the group behind the Preliminary Proxy includes the former Chairman of the CytoDyn Board of Directors, who served in that role from 2013 to 2018 and was a director until 2019.  Although undisclosed, the Preliminary Proxy

appears to be complaining about the prior work and actions of its own supporters.  But this misleading characterization is just the tip of the iceberg.

Most disturbingly: the Preliminary Proxy nowhere mentions that one of its proponents, Jeffrey Beaty, and one of the putative nominees, Bruce Patterson, previously proposed that CytoDyn engage in a $350 million transaction through which they and their families would personally benefit to the tune of approximately $123 million.

Patterson is the founder and CEO of IncellDx, Inc. ("IncellDx"), a privately held diagnostics laboratory company specializing in the design of assays for different diagnostics and performing diagnostic tests.  Beaty is a current IncellDx director.  But undisclosed in the Preliminary Proxy:  in May 2020, IncellDx, via Patterson, proposed that CytoDyn acquire IncellDx (an unprofitable company with, upon information and belief, less than $4 million in revenue in 2019), *for $350 million in cash and stock* (and, that Patterson be employed by the post-merger entity).  This was undoubtedly an attractive proposal from Patterson's and Beaty's perspectives: upon information and belief, Patterson and his wife own roughly 33% of IncellDx and Beaty owns 2.3%.  The transaction they proposed would thus enrich Patterson's family by as much as $115 million and Beaty by roughly $8 million.

CytoDyn rejected Patterson's and Beaty's absurd, self-enriching proposal.  Undeterred, Patterson and Beaty are now leading an effort to replace a majority of the CytoDyn Board, situating themselves to effectuate that very plan and create a windfall for themselves.  And yet they are doing so all while failing to tell the Company's stockholders about their self-enriching proposal.

Further, the Preliminary Proxy falsely suggests that that there are no "adverse proceedings" between any of the Defendants and the Company.  From 2018 to 2020, Patterson was a paid consultant for the Company whose consulting contract reflected that "nothing" therein would "be

construed as giving [Patterson] any right, title, interest or ownership of Proprietary Information." This was important because Patterson was then working with CytoDyn on research tasks to determine if the Company's primary drug candidate, leronlimab, could aid patients critically ill with COVID-19.  Patterson consequently had access to sensitive, proprietary Company data. Despite his promises, Patterson secretly took CytoDyn's data and caused IncellDx to file a patent application with the United States Patent and Trademark Office ("USPTO") *after* CytoDyn had already filed its own patent application relating to the same data.  After CytoDyn learned of Patterson's deception, the Company filed a successful third party submission with the USPTO to block issuance of IncellDx's later-filed and invalid patent application claims.  CytoDyn demonstrated that IncellDx's claims were neither "novel" nor "non-obvious," based upon publicly available references that IncellDx had failed to submit to the USPTO.  Upon review of those 'new' references, the USPTO rejected IncellDx's application as unpatentable because it was anticipated by and subject to CytoDyn's earlier-filed patent application (which was granted to CytoDyn on June 29, 2021).  None of this is disclosed in the Preliminary Proxy.

The Preliminary Proxy also deliberately obfuscates who is behind the curtain:  members of a group that agreed to act together regarding CytoDyn's common stock and filed a beneficial ownership report on Schedule 13D.  That group includes two of the Company's former directors. One, the Company's former Chief Medical Officer (Richard G. Pestell) and former Vice Chairman of the CytoDyn Board, was fired for cause, which automatically ended his directorship (he then commenced litigation against the Company).  The other, as noted above, is a former CytoDyn Board Chair (Anthony D. Caracciolo).  Stockholders deserve to know that these individuals, who plainly have their own unique motivations for taking action regarding CytoDyn, are involved here. But neither of their names appears in the Preliminary Proxy.

In short: the Preliminary Proxy is false and misleading, and violates the federal securities laws in myriad ways (as do other of Defendants' filings and public statements). CytoDyn respectfully asks that the Court order Defendants to make corrective disclosures rectifying their many materially false and misleading statements, and enjoin them from soliciting any proxies for the Company's 2021 annual meeting until corrective disclosures are issued and the market has the opportunity to absorb that information.

## PARTIES AND NON-PARTIES

1.      Plaintiff CytoDyn is a late-stage biotechnology company. CytoDyn trades on the OTCQB under the ticker "CYDY," is incorporated in Delaware, and has its principal place of business in Vancouver, Washington. The Company was founded in 2002, and is primarily focused on the clinical development and potential commercialization of leronlimab as a platform drug for a variety of indications. Leronlimab is a monoclonal antibody that attaches to the CCR5 receptor; the CCR5 receptor is located on the surface of a variety of cells, including white blood cells and cancer cells. It is thus an important target for research regarding many disease processes, including cancer metastasis and certain immunological conditions.

2.      Non-Party IncellDx is a private diagnostic company that purports to provide clinical patient information in a manner that enables classification and analysis of proteomic and geonomic biomarkers. As described below, CytoDyn and IncellDx have historically collaborated on certain research projects relating to leronlimab.

3.      Defendant Jeffrey P. Beaty is a director of IncellDx, and owns approximately 2.3% of IncellDx common stock. Upon information and belief, Beaty founded and moderates a Reddit page titled "r/CYDY: All things regarding CytoDyn and their blockbuster drug Leronlimab," using the username "u/Superchet." Beaty is a resident of Illinois.

4.      Defendant Paul A. Rosenbaum is the Chief Executive Officer of SWR Corp. and a resident of Oregon.

5.      Defendant Arthur L. Wilmes is a consultant at Step2 Management, Inc. and a resident of Indiana.

6.      Beaty, Rosenbaum, and Wilmes (together, the "Nominating Stockholders") have purported to nominate five individuals (the "Putative Nominees") for election to the CytoDyn Board.  Rosenbaum is among those Nominees.

7.      Defendant Bruce Patterson, M.D. is another of the Nominating Stockholders' Putative Nominees to the CytoDyn Board.  As described below, from 2018-2020, Patterson worked as a consultant for CytoDyn in his role as CEO of IncellDx.  Patterson is also IncellDx's founder and Chief Executive Officer, and owns 17.92% of its common stock.  Upon information and belief, Patterson's wife owns approximately 15.12% of IncellDx common stock.  Patterson also posts on Twitter using the handle "@brucep13."   Patterson is a resident of Michigan.

8.      Defendant Thomas J. Errico, M.D., a Florida resident, is another of the Nominating Stockholders' Putative Nominees to the CytoDyn Board.

9.      Defendant Peter Staats, M.D., a Florida resident, is another of the Nominating Stockholders' Putative Nominees to the CytoDyn Board.

10.     Defendant Melissa Yeager, a Washington resident, is another of the Nominating Stockholders' Putative Nominees to the CytoDyn Board.

11.     Defendant CCTV Proxy Group, LLC ("CCTV") is a Delaware limited liability company that, upon information and belief, was incorporated in Delaware by Rosenbaum, as a representative of the Nominating Stockholders, on May 18, 2021 for purposes of pursuing the proxy fight described herein, and is located in Portland, Oregon.   CCTV is controlled by

Rosenbaum, and has been publicly disclosed as bearing the "entire expense of soliciting proxies" related to the matters described below.

12.     The Nominating Stockholders, the Putative Nominees, and CCTV (together, the "Proxy Filers") caused the filing of the Preliminary Proxy with the SEC on July 20, 2021.

13.     Other non-parties are also relevant here.  The Nominating Stockholders, the Putative Nominees, and twenty-one other individuals caused the filing of a beneficial ownership report on Schedule 13D on May 24, 2021, as amended on June 8 and July 2 (the "Dissident Group").  Such a filing is required by law when individuals owning in excess of five percent of a company's voting stock form a group for the purposes of acquiring, holding, voting or disposing of such stock.  But the names of the twenty-one members of the Dissident Group who were not identified as Proxy Filers do not appear in the Preliminary Proxy.

14.     Non-Party Anthony D. Caracciolo is one such omission.  Caracciolo is a member of the Dissident Group identified on the Schedule 13D, who joined the CytoDyn Board in 2011. In June 2013, Caracciolo was appointed as the Chairman of the CytoDyn Board; from 2017-2018 he also held the title of Executive Chairman and thus assumed an active leadership role in the Company's strategic planning, business development, and operations.  Caracciolo resigned from the CytoDyn Board in January 2019.

15.     Non-Party Richard G. Pestell is another such omission.  Pestell is another member of the Dissident Group disclosed on the Schedule 13D, and CytoDyn's former Chief Medical Officer; on July 26, 2019, CytoDyn announced that it had terminated Pestell for cause, leading to his removal from the CytoDyn Board.

## JURISDICTION AND VENUE

16.     This action arises under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a), and the applicable rules and regulations of the SEC.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and personal jurisdiction over the Defendants under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue in this District is proper, under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.  Various acts or transactions constituting the offenses described herein, relating to public statements regarding the election of directors of a Delaware corporation, occurred in or targeted the District of Delaware.

## FACTUAL BACKGROUND

### 2018-Early 2020:  Patterson and IncellDx Begin To Work With CytoDyn

18.     On October 10, 2018, Patterson and CytoDyn entered a consulting agreement (the "Consulting Agreement") pursuant to which Patterson would aid CytoDyn on certain projects as an independent contractor.  Among other things, Patterson agreed in the Consulting Agreement that he did not have "any right, title, interest in or ownership of Proprietary Information" and that any work product "conceived, made, reduced to practice, or discovered" by Patterson "in the course of any work performed for [CytoDyn]" would "be the sole and exclusive property of [CytoDyn]."  The Consulting Agreement was later amended three times, each to raise Patterson's compensation – ultimately, to $20,000 per month.

19.     On July 17, 2019, CytoDyn and IncellDx entered a license and supply agreement pertaining to non-commercial grade quantities of the Company's drug and related materials.

20.     From October 2018 through May 2020, Patterson assisted CytoDyn with certain assay tests relating to HIV and COVID-19.  In this period, Patterson also appeared in a number of

interviews with CytoDyn executives to discuss CytoDyn's ongoing research.  For example, on December 10, 2019, Patterson appeared in an interview with CytoDyn CEO Nader Pourhassan regarding an ongoing breast cancer clinical trial.[1]  On April 2, 2020, in another joint interview, Patterson spoke about the results from a study involving patients that were experiencing severe COVID-19 symptoms, and the impact of the Company's drug, leronlimab, with reference to treatment of "cytokine storm."[2]  And on April 30, in another joint interview, Patterson again described patient reactions to ongoing research using leronlimab.[3]  These interviews evidence Patterson's ongoing role in CytoDyn's clinical trials through mid-2020, and his role in helping to communicate with the Company's investors regarding those projects.

## May 2020:  Patterson and IncellDx's $350 Million Proposal

21.    On May 22, 2020, Patterson provided a proposal to CytoDyn requesting that CytoDyn purchase IncellDx for $350 million (including milestone payments for certain development and sales milestones), and that Patterson be employed by CytoDyn following the proposed acquisition (the "$350M Proposal").  The $350M Proposal reflects Patterson and IncellDx's erroneous belief that they were responsible for "significant share price appreciation" at CytoDyn and requested a response within weeks; otherwise, IncellDx would "explore other paths should this collaboration not be feasible."

22.    Around the same time, Patterson ended his CytoDyn consultancy to try and create leverage to force CytoDyn to purchase IncellDx as he requested, believing himself indispensable.

---

[1] *See* Proactive, *CytoDyn Offers Update on Leronlimab Following Encouraging Results on Breast Cancer Trial*, YOUTUBE (Dec. 10, 2019), https://www.youtube.com/watch?v=SMAywRpSzfk.
[2] *See* Proactive, *Cytodyn Sees Impressive Results with Leronlimab on Very Ill COVID-19 Patients*, YOUTUBE (April 2, 2020), https://www.youtube.com/watch?v=Nh3REKqyzMI.
[3] *See* Proactive, *CytoDyn Continues to Report Strong Results From COVID-19 Patients Using Leronlimab*, YOUTUBE (April, 30 2020), https://www.youtube.com/watch?v=hhS229ekx4Y.

23.     CytoDyn rejected Patterson and IncellDx's proposal to purchase for $350 million a company with less than $5 million in revenue.

24.     Nonetheless, the $350M Proposal, if consummated, would create a substantial upside opportunity for Patterson.  Patterson has disclosed a 17.92% interest in IncellDx; the $350M Proposal thus represented a potential $62.7 million benefit to Patterson.

25.     Upon information and belief, Patterson's wife owns 15.12% of IncellDx common stock; the $350M Proposal thus represented a potential $52.9 million benefit to her.  Combined, Patterson's family stood to personally receive as much as $115 million.

26.     The $350M Proposal also created a substantial upside opportunity for Beaty, an IncellDx director, who has disclosed that he owns a 2.3% interest in IncellDx.  The $350M Proposal thus represented a potential $8 million benefit to him.

27.     Because IncellDx is a private company, there are no public records indicating whether other members of the Dissident Group own IncellDx common stock and stood to benefit from the $350M Proposal.

**2020-2021:  Patterson and IncellDx Seek To Patent CytoDyn's Intellectual Property**

28.     On March 30, 2020, CytoDyn filed a provisional patent application (No. 63/002,161, titled "Methods of Treating Coronavirus Infection") with the USPTO, on the basis of CytoDyn's studies involving the clinical treatment of subjects infected with SARS-CoV-2 with CytoDyn's leronlimab and analysis of patient samples for known biomarkers.  CytoDyn made an additional six related provisional applications between April 7, 2020 and May 1, 2020 to include disclosure of continuing study results.

29.     On April 27, 2020, unbeknownst to CytoDyn, IncellDx filed substantially similar data drawn from CytoDyn's clinical studies in support of its own application and claiming methods

of treatment using CytoDyn's leronlimab (No. 63/016,155, titled "Use of CCL5/RANTES in Assessment of Infectious Diseases Characterized by Cytokine Storms") (the "USPTO Proceeding").  This data belonged to CytoDyn pursuant to the terms of the Consulting Agreement. Specifically, Patterson had agreed to "irrevocably assign[] to [CytoDyn] all right, title and interest worldwide in and to [CytoDyn] Work Product and all applicable intellectual property rights related thereto . . . ."

30.     CytoDyn only became aware of IncellDx's application and effort to block CytoDyn from obtaining patent rights for methods of treating SARS-CoV-2 infected subjects with leronlimab after IncellDx's application had been filed.

31.     After learning of IncellDx's application, CytoDyn filed a successful third-party submission (the "Third Party Submission") pertaining to IncellDx's non-provisional patent application (17/067,191).  The Third Party Submission pointed to evidence that IncellDx's patent claims were not "novel," nor were they "non-obvious" according to publicly available references that IncellDx had failed to submit to the USPTO—and that had not yet been considered by the USPTO.  Upon review of the 'new' references submitted to the USPTO by CytoDyn, the USPTO rejected IncellDx's patent efforts to claim methods of treating subjects with critical or severe SARS-CoV-2 using CytoDyn's leronlimab as being unpatentable.  Indeed, the USPTO determined that such claims are not only anticipated by CytoDyn's earlier-filed patent application, but are also already subject to the claims of CytoDyn's U.S. Patent No. 11,045,546, which was granted to CytoDyn on June 29, 2021.

### May-June 2021:  The Dissident Group Forms And Files A Schedule 13D

32.     On May 24, 2021, twenty-four individuals filed a beneficial ownership report on Schedule 13D pertaining to CytoDyn, evidencing that as of May 14, 2021 they were acting as a

"group" (within the meaning of Section 13(d) of the Exchange Act) and collectively owned more

than five percent of CytoDyn's voting stock (as amended, the "Schedule 13D").[4]  Among them

were the Nominating Stockholders (Beaty, Rosenbaum, and Wilmes) and non-parties Caracciolo

and Pestell.[5]   Upon information and belief, however, Rosenbaum was soliciting CytoDyn

stockholders beginning as early as March 2021, and had formed a "group" that would be required

under Section 13(d) of the Exchange Act to file a statement of beneficial ownership on

Schedule 13D well before May 24, 2021.

33.   The May 24 Schedule 13D explained that its filers:

> intend to have discussions with representatives of the Issuer's management and
> board of directors . . . relating to, among other things, shareholder value, operational
> failures, performance, management, underperformance relative to its peers, and the
> Reporting Persons' lack of confidence in management.  The Reporting Persons may
> seek stockholder representation on the Board, as appropriate, including but not
> limited to through the initiation of a proxy contest at the Issuer's 2021 annual
> meeting of stockholders.  Mr. Rosenbaum is acting as the representative of the
> Reporting Persons.

34.   On June 8, 2021, the Schedule 13D was amended, and was then filed by twenty-six

individuals.[6]  This added Defendant and Putative Nominee Errico.

35.   On July 2, 2021, the Schedule 13D was amended again,[7] and then filed by twenty-

eight individuals, including all Defendants except CCTV (as defined above, the "Dissident

Group").  This amendment, therefore, added Putative Nominees Patterson, Staats, and Yeager as

---

[4] CytoDyn, Inc., Information to Be Included in Statements (Form 13D) (May 24, 2021)
https://www.sec.gov/Archives/edgar/data/1175680/000110465921071328/tm2117322d1_sc13d.
htm.
[5] *Id.* at 25-26.
[6] CytoDyn, Inc., Information to Be Included in Statements (Form 13D/A) (June 8, 2021)
https://www.sec.gov/Archives/edgar/data/1175680/000110465921078265/tm2119016d1_sc13da.
htm.
[7] CytoDyn, Inc., Information to Be Included in Statements (Form 13D/A) (July 2, 2021)
https://www.sec.gov/Archives/edgar/data/1175680/000110465921088820/tm2121222d2_sc13da.
htm.

signatories.  As to Patterson, the filing explained that the "shares listed as being beneficially owned by Dr. Patterson are directly owned by IncellDx, of which Dr. Patterson is the Chief Executive Officer.  Mr. Patterson owns a 17.92% stake in IncellDx."  *Id.* at 33.

36.    On June 30, 2021 (as explained in the amended Schedule 13D, under the header "Purpose of Transaction"), the Nominating Stockholders delivered a letter to CytoDyn purporting to nominate the five Putative Nominees to the CytoDyn Board.  *Id.* at 34.  The Schedule 13D went on to identify the Putative Nominees and described Patterson as "Founder and Chief Executive Officer at IncellDx," and noted his educational background and prior professorial positions – but not, among other things, Patterson's prior consulting arrangement with CytoDyn, the USPTO Proceeding, or the $350M Proposal.  *Id.*

37.    As noted, neither the Schedule 13D nor its amendments disclose the existence of CCTV, nor CCTV's role in the proxy contest.  Moreover, neither the Schedule 13D nor its amendments disclose the contracts, arrangements and understandings that result in the formation of CCTV and its relationship with the Nominating Stockholders, the Putative Nominees, and the remaining members of the Dissident Group in respect of the proxy contest or otherwise.

**July 1, 2021:  Defendants Announce Their Campaign**

38.    On July 1, 2021, the Defendants announced the nomination of the Putative Nominees via a press release filed with the SEC, which appended a letter to CytoDyn stockholders and the copy of the Dissident Group's website, www.advancingll.com (the "Campaign Announcement," a copy of which is attached as Exhibit A).

39.    The Campaign Announcement reflects disclosures regarding the Putative Nominees and Defendants' electoral platform.  *See* Ex. A at Ex. 2.  It otherwise contains varied statements improperly attacking the reputation and character of the CytoDyn Board and

management.[8]   Significantly, it omits material information, including Patterson's CytoDyn consultancy, the $350M Proposal, the USPTO Proceeding, and the identities and backgrounds of members of the Dissident Group.

**July 20, 2021:  Defendants File The Preliminary Proxy,
Violating the Federal Securities Laws By Failing To Disclose
Material Conflicts Of Interest Or Accurately Describe Their Supporters**

40.    On July 20, 2021, Defendants filed the Preliminary Proxy with the SEC, a copy of which is attached hereto as Exhibit B.

41.    The  Exchange Act, Section 14(a), 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.  Rule 14a-9, 17 C.F.R. § 240.14a-9(a), prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."  The Preliminary Proxy, however, is materially false and misleading in several respects.

**The Preliminary Proxy Fails To Disclose Patterson's Self-Enriching $350 Million Proposal**

42.    The Preliminary Proxy altogether fails to disclose the $350M Proposal.  Needless to say, it would be highly material to any stockholder to know that Patterson and Beaty, proponents of a takeover of the CytoDyn Board, recently advocated that CytoDyn spend $350 million to acquire IncellDx, of which, $115 million and $8 million, respectively, would flow to themselves and/or their families.

---

[8] *E.g.*, Ex. A at Ex. 2 (letter misleadingly asserting that "the current Board and management . . . mishandle stewardship" of drug, that the Company "cannot afford another year of poor leadership, mismanagement and broken promises", that "[CytoDyn has repeatedly misled investors", and that "current leadership has made numerous errors and misleading statements in investor communications").

43.     The $350M Proposal creates a conflict of interest between the interests of the average CytoDyn stockholder and those of Patterson and Beaty.   Should Patterson, Beaty, and their colleagues succeed in electing a new CytoDyn Board majority, they will be in a position to effectuate the $350M Proposal.  Stockholders are unequivocally entitled to understand these plans, and consider Patterson and Beaty's self-enriching proposal, in connection with the solicitation.

44.     The failure to disclose this critical fact alone warrants injunctive relief; rectifying this failure will require, among other things, confirmatory statement regarding (i) the amounts Patterson, Beaty, and their respective family members stood to receive from the $350M Proposal; (ii) whether the Defendants intend to implement the $350M Proposal (or, any similar transaction); and (iii) whether any other members of the Dissident Group have any interest in IncellDx that likewise calls into question their interests in the solicitation.

45.     The failure to disclose the $350M Proposal also renders other sections of the Preliminary Proxy false or misleading.

46.     For example, the Preliminary Proxy states that "[e]xcept as set forth in this Proxy Statement":

> (ix) no participant in this solicitation or any of his or its associates was a party to any transaction or series of similar transactions, since the beginning of the Company's last fiscal year, or is a party to any ***currently*** proposed transaction, or series of similar transactions, to which the Company or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $120,000;

(*See* Preliminary Proxy p. 15-16 (emphasis added)).  This statement is materially misleading because it reflects an apparently deliberate decision to avoid disclosing the $350M Proposal made just last year.

47.     That same paragraph continues:

> (x) no participant in this solicitation or any of his or its associates has any arrangement or understanding with any person with respect to any future

employment by the Company or its affiliates, or with respect to any future transactions to which the Company or any of its affiliates will or may be a party.

(*Id.*)  Because the omitted $350M Proposal also contemplated that Patterson would execute an employment agreement with the Company post-merger, this too may well be false.

48.    The Preliminary Proxy also misleadingly describes the Putative Nominees' future plans for CytoDyn as centering on an amorphous "comprehensive turnaround plan."  This vague characterization does not disclose the $350M Proposal, or the nature of the Defendants' present intentions regarding CytoDyn.  (*See* Preliminary Proxy at 6).

### The Preliminary Proxy Fails To Disclose The USPTO Proceeding

49.    The Preliminary Proxy likewise altogether fails to mention the USPTO Proceeding in which Patterson (and IncellDx) have been adverse to CytoDyn.  The fact that Patterson effectively sought to claim the Company's intellectual property as his own calls into question his character and fitness to serve as a director, and how he would otherwise resolve any conflicts between CytoDyn and IncellDx.  Stockholders can assess his actions for themselves – but only if Defendants are forthcoming.

50.    Defendants' material omission renders other portions of the Preliminary Proxy false.  The Preliminary Proxy also states:  "There are no material proceedings to which any participant in this solicitation or any of his or its associates is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries."  (*See* Preliminary Proxy at 16; *see also id.* at 9 ("None of the Nominees is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries in any material pending legal proceedings.")).  Patterson's and IncellDx's USPTO Proceeding is plainly a proceeding in which Patterson is "adverse to the Company"; the failure to disclose it in turn renders this statement false.

## The Preliminary Proxy Misleadingly Describes
## Patterson's Background and Board Qualifications

51.     The failure to disclose the $350M Proposal or the USPTO Proceeding also renders

each description of Patterson's background false and misleading.  For example, the following

appears at Preliminary Proxy pages 7 to 8[9]:

> **Bruce Patterson, M.D.**, age 63, is a leading authority on the effects of viral
> pathogens on the human immune system. He currently serving as Founder and,
> since October 2009, Chief Executive Officer of IncellDx, a leading biotechnology
> molecular diagnostics company. In this role, Dr. Patterson has pioneered
> technologies that have led to advances in detection, prognosis, and treatment of
> patients infected with HIV, HPV, cervical cancer, COVID-19, and other diseases.
> Dr. Patterson has also created companion diagnostics for FDA clinical trials run by
> Merck, Pfizer, and others, and has 91 issued and pending patents worldwide.  Dr.
> Patterson previously served as an Associate Professor and Medical Director of
> Diagnostic Virology at Stanford University Hospitals and Clinics, where he was
> also Director of Clinical Virology, and Co-Director of the AIDS Research Center.
> While at Stanford, Dr. Patterson was selected by his peers to enroll in the esteemed
> Physician Leadership Program taught by Stanford's Graduate School of Business
> faculty. Dr. Patterson graduated from the University of Michigan with a Bachelor
> of Science in microbiology and received his M.D. from The Feinberg School of
> Medicine at Northwestern University. The Investor Group believes that Dr.
> Patterson's medical and industry expertise will make him a valuable addition to the
> Board.

This description would leave any interested stockholder with the sense that Patterson is a third-

party with no prior dealings with CytoDyn whatsoever.  This description of Patterson's

background and alleged fitness for service on the CytoDyn Board is thus egregiously false and

misleading, insofar as it fails to disclose (i) his prior consulting work for CytoDyn[10]; (ii) the fact

of the $350M Proposal, and the roughly $115 million benefit his family would have obtained from

---

[9] The Campaign Announcement contains a similarly flawed biography for Patterson, making no
mention of, for example, his CytoDyn consultancy, the $350M Proposal, or the USPTO
Proceeding. Ex. A at Ex. 2.

[10] The only hint at any of these issues is that the date and existence of the Consulting Agreement
is noted in "Schedule III," but not in the main body of the Preliminary Proxy.  Even if deemed a
fair disclosure of the fact of Patterson's prior work for CytoDyn, this disclosure buried in a
schedule does not address the nature of his work pursuant to that agreement, the $350M Proposal,
or the USPTO Proceeding.

that proposal; or (iii) his USPTO filings that were adverse to CytoDyn and constituted an effort to usurp the Company's intellectual property.

### The Preliminary Proxy Falsely Suggests Its Proponents Are CytoDyn Outsiders

52.     The Preliminary Proxy's description of its proponents and their incentives is wildly misleading.  The cover letter to the Preliminary Proxy claims that it is being filed by "long-term stockholders" who have "[f]or the past seven years . . . attempted to work with management to help solve the Company's issues, yet they have continually refused to engage with us constructively."  This sentiment is repeated elsewhere in the proxy.  (*See* Preliminary Proxy at 5 ("For the past seven years we have remained patient with [CytoDyn's] leadership . . . .  During this time, we have sought to be constructive investors, attempting to work with management to help solve the Company's issues, yet they have continually refused to accept advice from highly qualified professionals outside of their inner circle.")).[11]

53.     Most fundamentally, this description fails to acknowledge that the Dissident Group *includes multiple former CytoDyn directors, employees and consultants from the aforementioned seven-year window*:  (1)  Caracciolo, a member of the CytoDyn Board from 2011 to early 2019, its Chairman from 2013 to 2018, and the Company's Executive Chairman, with day-to-day managerial responsibilities from 2017-2018; (2)  Pestell, another former CytoDyn director (and Vice Chair) and also its former Chief Medical Officer, who was terminated for cause in 2019 which ended his directorship; and (3) Patterson, a paid consultant from 2018 to 2020 (who, as outlined above, regularly appeared in public interviews with CytoDyn's CEO).  Needless to say, a

---

[11] As noted above, the Campaign Announcement includes similar misleading characterizations. Ex. A at Ex. 2 (incorrectly describing proponents as "long-time, constructive investors of CytoDyn"; "For the past seven years, we have remained patient with [CytoDyn's] leadership . . . During this time, we have sought to be constructive, attempting to work with management to help solve the Company's issues.").

reasonable investor would view Defendants' purported complaints about "CYDY's leadership" over "the last seven years" differently if they were informed that the complaints were coming from a group of people who were working with and for the Company in those same seven years (*e.g.*, the former Chairman of the Board).  The Dissident Group is, in essence, complaining about the work and actions of its own members.

54.    Further, upon information and belief, although the Preliminary Proxy describes its proponents as being "long-term stockholders," many traded in and out of CytoDyn's common stock during this time period.

55.    This obfuscation regarding the Schedule 13D Filers also hides other issues from stockholders.  Although the fact of the Schedule 13D filing is mentioned in passing, the Preliminary Proxy does not acknowledge who the members of that group are, or that it was formed to effectuate the proxy contest.  (*See supra* ¶ 33 (Schedule 13D stating that "[t]he Reporting Persons may seek stockholder representation on the Board, as appropriate, including but not limited to through the initiation of a proxy contest at the Issuer's 2021 annual meeting of stockholders.  Mr. Rosenbaum is acting as the representative of the Reporting Persons.")).

56.    Both Caracciolo and Pestell have sued the Company: Pestell, in connection with the Company terminating him for cause; Caracciolo, seeking additional payments from the Company and as a derivative representative.[12]  The fact of these litigations alone suggests neither is attempting to work "constructively" with the Company as the Preliminary Proxy suggests.  But further, neither of their names, let alone their former roles at the Company are disclosed in the Preliminary Proxy (nor is Pestell's termination for cause).  And as to these two individuals, the

---

[12] *Alpha Venture Capital Partners LP v. Pourhassan*, No 3:20-cv-05909-JLR (W.D. Wash. Sept. 10, 2020); *Alpha Venture Capital Partners LP v. Pourhassan*, No. 2020-0307 (Del. Ch. Aug. 24, 2020); *Pestell v. CytoDyn Inc.*, No. 1:19-cv-01563 (D. Del. Aug. 22, 2019).

above-noted statement that there are "no material proceedings to which any participant in this solicitation or any of his or its associates is a party adverse to the Company or any of its subsidiaries or has a material interest adverse to the Company or any of its subsidiaries" is inherently misleading.

57. Lastly, in a similar vein, the Preliminary Proxy states that CCTV, "an entity controlled by Paul Rosenbaum," will bear "[t]he entire expense of soliciting proxies." Given all of the above – including the failure to disclose the $350M Proposal, and the lack of clarity as to whether others among the Dissident Group have an interest in IncellDx – it is critical that the Preliminary Proxy identify all parties with an interest in CCTV (*i.e.*, each of its members, as well as its sources of funding) so that stockholders may know who is controlling CCTV and paying the expenses of this proxy contest.

58. In short: stockholders deserve to receive a clear and unambiguous statement of *who* is acting with regard to this solicitation, in order to assess their interests and proposals accurately.

### The Preliminary Proxy Fails To Provide Information Mandated By The SEC

59. In addition to the above, the Preliminary Proxy violates Rule 14a-101, "Information required in proxy statement," because it fails to provide a number of the details mandated by statute.

60. Item 1 of Rule 14a-101 requires that the Preliminary Proxy furnish the information required by Rule 14a-5(e), which in turn requires disclosure of "[t]he date after which notice of a shareholder proposal submitted outside the processes of § 240.14a-8 is considered untimely, either calculated in the manner provided by § 240.14a-4(c)(1) or as established by the registrant's advance notice provision . . . ." 17 C.F.R. § 240.14a-101; 17 C.F.R. § 240.14a-5(e).

61.     The Preliminary Proxy does not include the deadline for stockholder proposals or nominations submitted outside of the processes of Rule 14a-8 that are not intended to be included in the Company's proxy statement.

62.     Item 4(a) of Rule 14a-101 requires that the Preliminary Proxy identify the total "anticipated cost" of the solicitation of security holders and state the "names of the persons by whom the cost of solicitation has been or will be borne, directly or indirectly." 17 C.F.R. § 240.14a-101.

63.     The Preliminary Proxy does not state the total estimated cost of the solicitation. And although the Preliminary Proxy states that CCTV is exclusively bearing the cost of the solicitation and that it is "controlled" by Rosenbaum, it does not disclose who else is "indirectly" paying the solicitation expenses because it does not disclose the names of all individuals with an interest in CCTV.

64.     Item 21 of Rule 14a-101 requires that the Preliminary Proxy disclose "the vote required for approval or election" as to each matter being voted on by stockholders, "other than for the approval of auditors." 17 C.F.R. § 240.14a-101.  It also requires disclosure of the "method by which votes will be counted, including the treatment and effect of abstentions and broker non-votes under applicable state law as well as registrant charter and by-law provisions." *Id.*

65.     The Preliminary Proxy Statement fails to state the effect of abstentions and broker non-votes on the vote required for the advisory vote on executive compensation. It also incorrectly states that abstentions will have no effect on the election of directors.  In fact, stockholders do not have the option to abstain from voting for any given director nominee; they only have the option to vote "FOR" or "WITHHOLD."

**Patterson and Beaty's Social Media Posts Also Violate The Federal Securities Laws**

66.     Rule 14a-1 defines "solicitation" to include "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy."  17 C.F.R. § 240.14a-1(l)(1)(iii).

67.     Rule 14a-3 requires that each person solicited shall be concurrently or previously furnished with "[a] publicly-filed preliminary or definitive proxy statement . . . containing the information specified in Schedule 14A.  17 C.F.R. § 240.14a-3(a)(1).

68.     The only potentially applicable exception is found in Rule 14a-12, which permits such a solicitation if each such written communication states the identity of the participants in the solicitation and "a description of their direct or indirect interests, by security holdings or otherwise, or a prominent legend in clear, plain language advising security holders where they can obtain that information . . . ."  17 C.F.R. § 240.14a-12(a)(1)(i).  Further, Rule 14a-12 requires that any such communications be publicly filed with the SEC "no later than the date the material is first published, sent or given to security holders."  *Id.*

69.     And of course, any such communications are also subject to the above-discussed Rule 14a-9 mandate to not make false or misleading material statements.  17 C.F.R. § 240.14a-9(a).  The Note to Rule 14a-9 further advises that, depending on the circumstances, among other things, "[m]aterial which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation," can be "misleading" for purposes of Rule 14a-9.

70.     The Preliminary Proxy was filed on July 20, 2021.  Prior to that date, however, Patterson and Beaty used social media to make various public statements and comments that constitute solicitations.  None, however, described the parties interested in the solicitation, nor

bore any "prominent legend" mandated by Rule 14a-12 regarding where to find such information. Each, therefore, was a violation of federal law.

71.     Patterson uses Twitter and posts using the handle @brucep13.  In the weeks preceding the July 20, 2021 Preliminary Proxy filing, Patterson tweeted, among other things:

A.     On May 25, 2021, a tweet implied that Patterson would be too busy as the CEO of both IncellDx and CYDY, if he were to hold both roles. Patterson replied: "Elon Musk had Tesla, Solar City, AND Space X!"

B.     On June 4, 2021, Patterson tweeted: "IncellDx didn't do any RO for the combination trial (BLA) and only the last third of the mono trial nor did we share any protocols.  Last we used labeled PRO140 in our RO assay so blaming us is like saying the drug doesn't bind to CCR5.  So this is a lie!"

C.     On July 2, 2021, an investor tweeted that they were "disappointed with the board group" that Patterson had joined and intended to "vote no [for the dissident slate] with [his/her] 500,000 shares . . . ." The next day, Patterson responded, stating that "[the dissidents] are all amazing as time will tell" and that "[w]e all want the same thing LL saving lives!"

D.     On July 4, 2021, an investor tweeted: "You stopped supporting [Leronlimab] meanwhile all the other doctors kept on. My large sum of votes + my families [sic] and friends are going to current management. Recknor has done a phenomenal job." On July 5, 2021, Mr. Patterson responded to the investor, stating: "ITS [sic] NOT AVAILABLE!"

E.     On July 17, 2021, an investor tweeted: "A lot of us LL investors trust you BP… I'm 34 and have put a decent bit of my life savings on CYDY. Can you tell me honestly what you think is best for CYDY stock in regards to 13D versus current people?" On the same day, Dr. Patterson tweeted in response: "It is an amazing drug with a target that is becoming critical in many diseases."

F.     On July 17, 2021, a tweet questioned whether the Company's HIV Biologics License Application (BLA) failed due to Mr. Pourhassan's refusal to pay Dr. Patterson, which is demonstrably false. Dr. Patterson tweeted in response: "Yes plus I can't imagine anyone speaking to the FDA about entry inhibitors but surprise—I wasn't asked!"

72.     Upon information and belief, Patterson has also engaged with CytoDyn stockholders via text message or e-mail to convey similar views.

73.     The above constitute solicitations within the Exchange Act Rules, and seek to sway votes and/or directly impugn the reputation of CytoDyn executives.  But, they lack any of the disclaimers, legends or information the law requires, nor were they filed with the SEC; each therefore is a violation of federal law.

74.     Beaty, upon information and belief, uses the Reddit username "u/superchet" and is a moderator for the Reddit page titled "r/CYDY: All things regarding CytoDyn and their blockbuster drug Leronlimab," which was formed in February 2020.  "Superchet" has posted myriad comments about CytoDyn and its executives – many, before the July 20, 2021 Preliminary Proxy was filed.  For example, approximately two months ago (*i.e.*, roughly seven weeks before the Preliminary Proxy was filed), in response to a user who commented "just get out if you keep 2nd guessing management.  Because your ideas are a waste of time…" "superchet" responded:

> 100% wrong.  It's more than ok to believe in a product but have issues with management.  Nader [CEO] and Kelly [Chairman] have shown themselves to be incompetent and less than truthful among other things.  Achieving shareholder value often involves changing management for a group more capable than the incumbent and it is my right as a shareholder to explore these options.

75.     Although participating in shareholder democracy is indeed a right, one must do so within the confines of federal law.  This statement slanders the reputation of CytoDyn executives without any factual basis, and constitutes an unpermitted solicitation for it pre-dates the filing of the Preliminary Proxy by many weeks in violation of Rules 14a-3 and 14a-9.

76.     On July 30, 2021, CytoDyn rejected the Nominating Stockholders' nomination notice as non-compliant with the Company's bylaws.

77.     On July 30, 2021, CytoDyn filed a Current Report on Form 8-K announcing that the Company's 2021 annual meeting has been scheduled to be held on October 28, 2021, with a record date for stockholders entitled to vote of September 1, 2021.

78.     On August 2, 2021, CytoDyn filed a Current Report on Form 8-K announcing the rejection of the nomination notice and including the letter to Rosenbaum as an exhibit.   The contents of the letter include, but are not limited to, the matters discussed herein.

79.     Media articles indicate that the Dissident Group nevertheless intends to wage a proxy contest.   A Reuters story published on August 2, 2021 states that the "activist group on Monday vowed to press on with its proxy contest . . . .   The company's 'attempt to invalidate our director nominations is a desperate action to further disenfranchise shareholders,' a spokesman said."[13]

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT
### AND RULES 14a-9 AND 14a-101
### (The Preliminary Proxy)

80.     CytoDyn hereby incorporates the allegations set forth in paragraphs 1 - 79 above as if fully set forth herein.

81.     The  Exchange Act, Section 14(a), 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

82.     Rule 14a-9 under the Exchange Act, 17 C.F.R. § 240.14a-9(a), prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."

---

[13] See REUTERS, *Biotech firm CytoDyn calls activists' board nomination notice invalid*, *available at* https://www.nasdaq.com/articles/biotech-firm-cytodyn-calls-activists-board-nomination-notice-invalid-sources-2021-08-02-0.

83.     The Preliminary Proxy is a false and misleading solicitation because, as identified and described above, it misstates or omits information regarding the $350M Proposal, the USPTO Proceeding, and the identities and backgrounds of the Dissident Group.  It thus fails to permit ordinary CytoDyn shareholders to assess the extent to which Defendants' interests are materially adverse to their own.

84.     Absent injunctive relief, the Company's stockholders will be irreparably harmed. CytoDyn stockholders are entitled to have a full and accurate understanding of the Defendants' interests and plans for the Company; Defendants' above-described false and misleading statements deprive the Company's stockholders of the information they need to vote on an informed basis. Defendants have made clear their intention to proceed on this basis, and thus this harm is continuing and will likely accrue further.

85.     Defendants consequently violated Section 14(a) of the Exchange Act and Rule 14a-9(a).  The Company has no adequate remedy at law for this violation.

**COUNT II:**
**VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT**
**AND RULES 14a-9 AND 14a-101**
**(The Campaign Announcement)**

86.     CytoDyn hereby incorporates the allegations set forth in paragraphs 1 - 85 above as if fully set forth herein.

87.     The Exchange Act, Section 14(a), 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

88.     Rule 14a-9 under the Exchange Act, 17 C.F.R. § 240.14a-9(a), prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with

respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."

89.     The Note to Rule 14a-9 further advises that, depending on the circumstances, among other things, "material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associates, without factual foundation" can be "misleading" for purposes of Rule 14a-9.

90.     The Campaign Announcement is a false and misleading solicitation because, as identified and described above, it misstates or omits information, including the $350M Proposal, the USPTO Proceeding, and the identities and backgrounds of all members of the Dissident Group. It also repeatedly impugns the character, integrity, and reputation of CytoDyn management without providing sufficient factual foundation.

91.     Absent injunctive relief, the Company's stockholders will be irreparably harmed. CytoDyn stockholders are entitled to have a full and accurate understanding of the Defendants' interests and plans for the Company; Defendants' above-described false and misleading statements deprive the Company's stockholders of the information they need to vote on an informed basis. Defendants have made clear their intention to proceed on this basis, and thus this harm is continuing and will likely accrue further.

92.     Defendants consequently violated Section 14(a) of the Exchange Act and Rule 14a-9. The Company has no adequate remedy at law for this violation.

## COUNT III:
## VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND
## RULES 14a-3, 14a-9, AND 14a-12
### (Patterson's Social Media Posts)

93.    CytoDyn hereby incorporates the allegations set forth in paragraphs 1 - 92 above as if fully set forth herein.

94.    The Exchange Act, Section 14(a), 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

95.    Rule 14a-3 requires that each person solicited shall be concurrently or previously furnished with a publicly-filed preliminary or definitive proxy statement containing the information specified in Schedule 14A. 17 C.F.R. § 240.14a-3(a)(1).

96.    Rule 14a-9 under the Exchange Act, 17 C.F.R. § 240.14a-9(a), prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."

97.    Rule 14a-12 provides that a solicitation may be made before furnishing a proxy statement if each written communication includes the identity of the participants in the solicitation and "a description of their direct or indirect interests, by security holdings or otherwise, or a prominent legend in clear, plain language advising security holders where they can obtain that information . . . ." 17 C.F.R. § 240.14a-12(a)(1)(i).  Further, Rule 14a-12 requires that any such communications be publicly filed with the SEC "no later than the date the material is first published, sent or given to security holders." *Id.*

98.    Patterson made a number of public statements that constitute solicitations prior to publication of the Preliminary Proxy, in violation of Rule 14a-3, and without any required

disclaimer language or filing with the SEC on the first day of use as mandated by Rule 14a-12. These statements were also false and misleading, in violation of Rule 14a-9.

99.     Absent injunctive relief, the Company's stockholders will be irreparably harmed. CytoDyn stockholders are entitled to have a full and accurate understanding of the Defendants' interests and plans for the Company; Defendants' above-described false and misleading statements deprive the Company's stockholders of the information they need to vote on an informed basis. Defendants have made clear their intention to proceed on this basis, and thus this harm is continuing and will likely accrue further.

100.    Patterson consequently violated Section 14(a) of the Exchange Act and the above-noted rules.  The Company has no adequate remedy at law for this violation.

## COUNT IV:
## VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT AND RULES 14a-3, 14a-9, AND 14a-12
### (Beaty's Social Media Posts)

101.    CytoDyn hereby incorporates the allegations set forth in paragraphs 1 - 100 above as if fully set forth herein.

102.    The Exchange Act, Section 14(a), 15 U.S.C. § 78n(a), prohibits soliciting proxies in violation of SEC rules.

103.    Rule 14a-3 requires that each person solicited shall be concurrently or previously furnished with a publicly-filed preliminary or definitive proxy statement containing the information specified in Schedule 14A.  17 C.F.R. § 240.14a-3(a)(1).

104.    Rule 14a-9 under the Exchange Act, 17 C.F.R. § 240.14a-9(a), prohibits making a solicitation "by means of any . . . communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with

respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."

105.    Rule 14a-12 provides that a solicitation may be made before furnishing a proxy statement if each written communication includes the identity of the participants in the solicitation and "a description of their direct or indirect interests, by security holdings or otherwise, or a prominent legend in clear, plain language advising security holders where they can obtain that information[.]" 17 C.F.R. § 240.14a-12(a)(1)(i).  Further, Rule 14a-12 requires that any such communications be publicly filed with the SEC "no later than the date the material is first published, sent or given to security holders."  *Id.*

106.    Beaty made a number of public statements that constitute solicitations prior to publication of the Preliminary Proxy, in violation of Rule 14a-3, and without any required disclaimer language or filing with the SEC on the first day of use as mandated by Rule 14a-12. These statements were also false and misleading, in violation of Rule 14a-9.

107.    Absent injunctive relief, the Company's stockholders will be irreparably harmed. CytoDyn stockholders are entitled to have a full and accurate understanding of the Defendants' interests and plans for the Company; Defendants' above-described false and misleading statements deprive the Company's stockholders of the information they need to vote on an informed basis. Defendants have made clear their intention to proceed on this basis, and thus this harm is continuing and will likely accrue further.

108.    Beaty consequently violated Section 14(a) of the Exchange Act and the above-noted rules.  The Company has no adequate remedy at law for this violation.

**COUNT V:**
**VIOLATION OF SECTION 13(d) OF THE EXCHANGE ACT**
**(The Schedule 13D)**

109.   CytoDyn hereby incorporates the allegations set forth in paragraphs 1 - 108 above as if fully set forth herein.

110.   Section 13(d) of the Exchange Act requires that investors acting as a group for purposes of acquiring, holding, or trading the stock of an issuer disclose the group's existence and make plain their intentions through a Schedule 13D, which must be filed within ten days after the group members collectively acquire the beneficial ownership of 5% or more of the issuer's stock.

111.   Rule 13d-101 outlines the information that must be disclosed in a Schedule 13D, including the names of each member thereof.  Item 6 thereof also requires disclosure of any "contracts, arrangements, understandings or relationships (legal or otherwise)" among members of the group, and "naming the persons with whom such contracts, arrangements, understandings or relationships have been entered into."

112.   The Dissident Group filed a Schedule 13D on May 24, 2021, claiming that their group was formed on May 14, 2021.

113.   Upon information and belief, these disclosures are false and misleading in at least three respects.

114.   First, the Schedule 13D does not disclose the existence of CCTV – an entity created for the very purpose of funding the Dissident Group's proxy campaign, and was thus should have been disclosed on Schedule 13D pursuant to Rule 13d-101.  The Dissident Group did not do so.

115.   Second, neither the Schedule 13D nor its amendments disclose the contracts, arrangements and understandings that result in the formation of CCTV and its relationship with

30

the Nominating Stockholders, the Putative Nominees and the remaining members of the Dissident Group in respect of the proxy contest or otherwise.

116.    Third, Rosenbaum was seeking to form a group months before then and, upon information and belief, formed a group as early as March 2021 and failed to make the required disclosure.

117.    Absent injunctive relief, the Company's stockholders will be irreparably harmed. CytoDyn stockholders are entitled to have a full and accurate understanding of the Defendants' interests and plans for the Company; Defendants' above-described false and misleading statements deprive the Company's stockholders of the information they need to vote on an informed basis. Defendants have made clear their intention to proceed on this basis, and thus this harm is continuing and will likely accrue further.

118.    Defendants have violated, and continue to violate Section 13(d) and Rule 13d-101 of the Exchange Act.  The Company has no adequate remedy at law for this violation.

## PRAYER FOR RELIEF

WHEREFORE, CytoDyn respectfully requests that the Court enter judgment against Defendants as follows:

(a)    declaring that the Preliminary Proxy violates Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)    declaring that the Campaign Announcement violates Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(c)    declaring that Patterson's social media statements violate Section 14(a) of the Exchange Act and Rules 14a-3, 14a-9, and 14a-12 promulgated thereunder;

(d)      declaring that Beaty's social media statements violate Section 14(a) of the Exchange Act and Rules 14a-3, 14a-9, and 14a-12 promulgated thereunder;

(e)      declaring that the Schedule 13D violates Section 13(d) of the Exchange Act and Rule 13d-101 promulgated thereunder;

(f)      ordering that Defendants publicly correct their material misstatements or omissions relating to CytoDyn securities, including by filing with the SEC complete and accurate disclosures required by Sections 13(d) and 14(a) of the Exchange Act (the "Corrective Statements");

(g)      preliminarily and permanently enjoining Defendants from publishing any soliciting materials, or soliciting or voting any proxies given to them until they file the Corrective Statements and the market has had enough time to absorb the information;

(h)      preliminarily and permanently enjoining Defendants from committing any further violations of the federal securities laws; and

(i)      granting any other relief the Court deems proper.

OF COUNSEL:

Andrew W. Stern
Isaac S. Greaney
Alex J. Kaplan
Charlotte K. Newell (#5853)
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019

Dated:  August 5, 2021

POTTER ANDERSON & CORROON LLP

By:  *Jonathan A. Choa*
    Kevin R. Shannon (#3137)
    Jonathan A. Choa (#5319)
    Christopher N. Kelly (#5717)
    1313 N. Market Street, 6th Floor
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE 19899
    (302) 984-6000
    kshannon@potteranderson.com
    jchoa@potteranderson.com
    ckelly@potteranderson.com

*Attorneys for Plaintiff*
*CytoDyn Inc.*